**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ROBERT W. FRIEND; IMOGENE
WILLIAMS, Executrix of the Estate of
Ralph B. Sayre, Deceased and as
Trustee under the Last Will and
Testament of Ralph Brown Sayre,
Deceased,

No. 96-2862

Plaintiffs-Appellees,

v.

ATTORNEYS LIABILITY PROTECTION
SOCIETY, a mutual risk retention
group,
Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of West Virginia, at Wheeling.
Frederick P. Stamp, Jr., Chief District Judge.
(CA-94-48)

Argued: October 29, 1997

Decided: December 4, 1997

Before LUTTIG and WILLIAMS, Circuit Judges, and
BULLOCK, Chief United States District Judge for the
Middle District of North Carolina, sitting by designation.

_____

Reversed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Robert L. Bays, BOWLES, RICE, MCDAVID, GRAFF
& LOVE, Parkersburg, West Virginia, for Appellant. James F. Com-

panion, SCHRADER, BYRD, COMPANION & GURLEY, Wheeling, West Virginia, for Appellees. **ON BRIEF:** John S. Bailey, Jr., BOWLES, RICE, McDAVID, GRAFF & LOVE, Parkersburg, West Virginia, for Appellant. James P. Mazzone, Michael A. Adams, SCHRADER, BYRD, COMPANION & GURLEY, Wheeling, West Virginia, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Plaintiffs-appellees Robert W. Friend and Imogene Williams brought this action seeking a declaratory judgment that defendant-appellant Attorneys Liability Protection Society ("ALPS") was liable, under a legal malpractice insurance policy issued by ALPS to Friend, for a judgment entered against Friend in another legal proceeding. The district court granted summary judgment for Friend, ALPS appeals, and for the reasons stated herein, we reverse.

I.

This lawsuit arises out of a state-court judgment entered against Friend relating to his work as an attorney for Imogene Williams, the executrix of the estate of Fred B. Sayre. When Friend was engaged as the attorney for the executrix, shortly after Sayre's death, the estate's assets were appraised at approximately $460,000 in personal property, and $265,000 in real estate. Although the executrix was required by law to file annual settlements accounting for the disbursements and expenses of the estate, only one such form was filed between Sayre's death in December, 1986, and March, 1993. That form was filed at the end of the first year (1987). In March of 1993, Friend, on behalf of Williams as Executrix of the estate, filed a complaint in state court against all of the heirs and beneficiaries of the

2

estate for the purpose of subjecting various tracts of real estate to sale to pay the debts of the estate. The complaint alleged that the personal estate of the decedent was insufficient to pay the debts and administrative costs of the estate. Almost simultaneously, Friend filed the five annual settlements from 1988 to 1992.

The heirs and beneficiaries responded by challenging Friend's fees, as revealed in the newly filed settlements, as grossly excessive. The parties asked the state court "to conduct an accounting and determine the assets and liabilities [of the estate] for the ultimate purpose of deciding if the personal assets were insufficient to pay the debts and cost of administration . . . [and] to determine the validity of the claimed debts and cost of administration." J.A. at 37. Examination of the estate's records ultimately established that Friend had billed attorneys' fees of more than $450,000 to the estate, as well as such fees of almost $60,000 to trusts set up by the estate. The state court found these fees to be unreasonable and excessive, ordered "that all amounts paid to Friend in excess of $105,000.00 shall be refunded by Friend," and entered against Friend "a judgment in favor of the estate and trust for such sums paid to Friend in excess of the amount allowed . . . ." J.A. at 54.

Shortly thereafter, Friend brought this action against ALPS in state court, seeking a declaratory judgment that his malpractice insurance policy extends coverage to the judgment entered against him by the state court. ALPS removed the lawsuit into federal court on the basis of diversity jurisdiction. The parties each submitted motions for summary judgment, and the district court granted summary judgment for Friend.

II.

Under the terms of the malpractice insurance policy, ALPS is obligated to pay, subject to certain limits, exclusions, and conditions, "all sums in excess of the deductible . . . which the Insured shall become legally obligated to pay as damages" resulting from legal claims against Friend "by reason of any act, error or omission in Professional Services rendered or that should have been rendered by the Insured . . . and arising out of the conduct of the Insured's profession as an attorney . . . ." J.A. at 249 (emphasis added). We hold that the judg-

3

ment entered against Friend by the state court does not constitute a sum which Friend has "become legally obligated to pay as damages" within the meaning of the insurance contract.

We disagree with the district court's characterization of the judgment entered against Friend in state court as an award for "damages to the estate in the form of excessive legal fees" resulting from "Friend's negligent rendering of services." J.A. at 721. As noted above, the state court itself described the underlying action as, inter alia, a proceeding "to determine the validity of the claimed debts and cost of administration," J.A. at 37, including, primarily, the attorneys' fees paid to Friend. Moreover, the state court characterized its judgment not as awarding damages, but rather as requiring the refund of excessive attorneys' fees. See J.A. 54 (memorandum opinion ordering that "all amounts paid to Friend in excess of $105,000.00 shall be refunded by Friend."); id. at 307 (formal order requiring Friend to "refund and return the difference between the amounts collected . . . and the fees and expenses approved . . . .").

Although the insurance policy does not define the term "damages," we do not believe that the ordinary meaning of this word would include a court-ordered refund of excessive attorneys' fees. Such a refund, after all, sounds not in damages, but in restitution. Nor do we discern within what is essentially a simple malpractice insurance policy any indication of an intention to extend coverage to a judgment of this sort. Neither as a matter of contract interpretation nor as a matter of common sense do we find any reason to believe the policy is meant to insure Friend's ability to collect and keep the full amount of the fees he chooses to bill for any given matter-- especially where, as here, those fees are judicially determined to be unreasonable and excessive.

III.

Even if we believed the state court judgment against Friend represented a sum Friend was obligated to pay as damages, we would yet be constrained to reverse the district court's grant of summary judgment, because the insurance policy explicitly excludes from coverage claims "based upon or arising out of any dishonest, intentional, fraudulent, criminal, or malicious act, error or omission committed by, at

4

the direction of, or with the consent of an Insured." J.A. at 252. For the reasons discussed below, we are confident not only that a jury could find that Friend's actions were intentionally dishonest, but also that such a finding would be required, as a matter of law.

In the course of finding Friend's fees to be excessive, the state court made numerous findings that essentially compel the conclusion that Friend's over-billing was both dishonest and intentional. Among the most revealing of these findings are the following:

>  4. Imogene Williams [the executrix of the estate] retained Robert W. Friend to represent the estate (and her) at the agreed rate of $80.00 per hour. <u>The evidence makes it obvious that Friend was more than willing to accept this employment and assist Imogene Williams in her personal whim to give the lawyer everything so the Skeens[the decedent's heirs] received nothing, even to the detriment of the beneficiaries of the Fred Sayre estate</u>.

>  5. <u>A substantial amount of the time which was expended by Friend in connection with this matter was used to assist Imogene Williams in carrying out her personal vendetta against the Audrey Sayre heirs and further her desire to deny any benefits to them from the Fred Sayre Estate</u> .

>  . . .

>  14. The evidence clearly shows that the second through sixth annual settlements (1988, 1989, 1990, 1991, 1992) were not filed until March, 1983. . . . <u>It appears to this Court that a definite conflict of interest developed with respect to Friend's representation in this case. On the one hand he had complete charge of this estate according to the testimony of Imogene Williams. . . . On the other hand, Friend kept charging the estate exorbitant fees which he hid from the beneficiaries and the Fiduciary Commissioner by his failure to file settlements timely</u>. . . .

>  . . .

5

20. As further evidence of Friend's taking advantage of the animosity existing between Imogene Williams and the Skeens is the fact that while the litigation [the widow's ultimately successful attempt to renounce the will in favor of her statutory share] was pending, he made an offer, which he claims was made in good faith. This offer was to pay $30,000 to settle all the claims of Audrey Sayre[the widow] to Fred Sayre's estate. . . . [T]he $30,000 offer was less than half of what Audrey Sayre would have received had she not renounced the will. Such an offer to take even less than what she was already entitled to receive cannot be considered to be made in good faith.

21. Friend employed an accounting firm to perform services which were normally performed by an attorney. The itemized billings by Friend for his fee strongly indicate that he charged for much of the same services performed by the accountants. . . .

J.A. at 39-45 (emphases added).[1]

At oral argument, Friend's counsel conceded the"damning" appearance of these findings, though he argued that, taken in context, they do not mean what they appear to mean. It is true that, in the course of subsequent proceedings, the state court declined to make more explicit findings that Friend's actions were intentional. See J.A. at 312 ("[T]he Court specifically declines to make further findings as to whether the actions by Robert W. Friend . . . were intentional . . . . The Court's Findings of Fact and Conclusions of Law shall speak for themselves."); J.A. at 687 (stating that the court had declined, during subsequent proceedings, to make determinations "[w]ith respect to intentional acts on the part of Mr. Friend"). However, given the striking nature of the findings it had already made, we believe it obvious that the state court's declination reflects its belief that the inference of intent from the initial findings was inescapable, not a belief that Friend's intent was something over which reasonable minds could disagree.

_____

[1] These excerpted findings are representative only. They by no means exhaust the entirety of the state court's incriminating findings.

6

Furthermore, in separate disciplinary proceedings arising out of Friend's representation of the Sayre Estate, the West Virginia Supreme Court of Appeals, <u>inter alia</u>, suspended Friend from legal practice for two years, subjected all of Friend's financial dealings with his clients to close and independent supervision for an additional two years upon his readmission to the bar, required Friend to return <u>all</u> the money he had received from the estate, and required disclosure of all of Friend's personal and business loans for five years. <u>See Lawyer Disciplinary Board</u> v. <u>Friend</u>, No. 23877, <u>reprinted in</u> Addendum to Appellant's Reply Brief. Given the legal system's traditional reluctance to impose stringent sanctions for lawyer misconduct, it is inconceivable that the West Virginia Supreme Court of Appeals would have imposed sanctions of this magnitude if it found Friend's actions neither dishonest nor intentional. This understanding of that court's decision is confirmed by several passages in its opinion that make all but explicit that court's belief that Friend acted intentionally, dishonestly, or both. <u>See id</u>. at 6-7, 9-10. **2**

## CONCLUSION

For the reasons stated herein, we reverse the judgment of the district court.

## <u>REVERSED</u>

_____

**2** The West Virginia Supreme Court of Appeals' disciplinary opinion was filed during the pendency of the instant appeal, and accordingly was not part of the record below. When the defendant-appellant appended that opinion to its reply brief, Friend moved to strike that portion of the brief on the grounds that it contains material outside the record on appeal. We deny Friend's motion. Not only has it never been thought inappropriate to take notice of a relevant judicial opinion decided during the pendency of an appeal, but Friend's attorney specifically discussed the content of the disciplinary opinion at oral argument, all but conceding the relevance of that opinion to the instant proceeding.